IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| THOMAS ROEHRMAN, *individually, and on behalf of all others similarly situated,* )<br>)<br>)<br>) | )<br>) Civil Action No. |
| Plaintiff, ) | ) CLASS-ACTION |
| v. ) | ) |
| LEADSMARKET.COM, LLC, MARKETING LABS LLC and NESMETAJU, LLC, )<br>)<br>) | ) **Jury Trial Demanded** |
| Defendants. ) | |

## CLASS ACTION COMPLAINT

THOMAS ROEHRMAN ("Plaintiff" or "Roehrman"), on behalf of himself and all others similarly situated, by and through his attorneys, Kimmel & Silverman, P.C., alleges the following against Defendants LEADSMARKET.COM, LLC ("Leadsmarket'), MARKETING LABS LLC ("Marketing Labs") and NESMETAJU, LLC ("Nesmetaju" and collectively with LeadsMarket and Marketing Labs "Defendants"):

## INTRODUCTION

1. Plaintiff's Class-Action Complaint is based on the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*

## BACKGROUND ON THE TCPA

2. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the TCPA into law, to protect consumers' privacy rights- specifically, the right to be left alone from unwanted telemarketing calls.

3. A leading sponsor of the TCPA described telemarketing "robocalls" as the "scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4. The TCPA, through the accompanying FCC regulations, 47 C.F.R. § 64.1200(c) *et seq.*, affords special protections for "residential subscribers" who register their phone numbers on the National Do Not Call Registry.

5. Since 2003, persons who register cell phone numbers on the Do Not Call registry have been considered to be "residential subscribers" for the purpose of 227(c)(5) and the Do Not Call registry. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

6. The TCPA treats SMS text messages the same as traditional voice calls. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 948 (9th Cir. 2009). This is not just a matter of judicial interpretation, as the statutory definition of "telephone solicitation" in the text of the TCPA explicitly covers "messages", in addition to traditional voice calls. *See* 47 U.S.C. § 227(a)(4).

7. 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c) provide that each person who receives more than one call within a 12-month period, where that called party did not provide express written consent upon a clear and conspicuous disclosure from the telemarketer, after the phone number was registered on the National Do Not Call Registry for more than 31 days is entitled to recover $500 per call, and up to $1,500 per call if the TCPA is wilfully or knowingly violated.

8. Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." Omnibus TCPA Order, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

9. In fact, in 2021 alone, there were over ***five million complaints*** from Americans to the FTC about unwanted telemarketing calls. Federal Trade Comm'n, *FTC Issues Biennial*

2

*Report to Congress on the National Do Not Call Registry (*Jan. 5, 2022) *available* at: https://www.ftc.gov/news-events/news/press-releases2022/01/ftc-issues-biennial-report-congress-national-do-not-call-registry.

10. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. See *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

12. This Court has personal jurisdiction over Defendants as they systematically conduct business in the State of Indiana.

13. Additionally, Defendants knowingly and purposefully sent text messages to Plaintiff on his cell phone with a "317" area code, which is associated with the Indianapolis metropolitan area, in the State of Indiana.

14. Through those acts, Defendants purposefully availed themselves to the State of Indiana.

15. Further, Plaintiff resided within this District at all times relevant hereto.

16. Plaintiff received the unwanted text messages at issue and thereby experienced the associated harm within this District.

17. Accordingly, personal jurisdiction exists, and venue is proper pursuant to 28 U.S.C. §1391 (b)(1) and §1391 (b)(2).

## PARTIES

18. Plaintiff is a natural person residing in Brownsburg, Indiana 46112.

19. Plaintiff is a "person" as that term is defined by 47 U.S.C. § 153(39).

20. Defendant LeadsMarket is a data-broker and lead generation company which operates in the subprime personal and payday loan industry and operates through "affiliates", "publishers" and "marketers" to promote websites owned by alter ego/affiliate entities through spam SMS text message campaigns.

21. LeadsMarket is a Nevada corporation with its principal place of business located at 21600 Oxnard Street, Suite 400, Woodland Hills, California 91367.

22. Defendant Nesmetaju is a foreign company domesticated in St. Kitts and Nevis.

23. Nesmetaju maintains its office at Springates Building, Lower Government Road, Charlestown, Nevis, Saint Kitts and Nevis.

24. Defendant Marketing Labs is a limited liability company which maintains an office in Sheridan, Wyoming.

25. Defendant Marketing Labs can be served through its registered agent at 30 N. Gould St., Suite R, Sheridan Wyoming 82801.

26. During the relevant time period, Nesmetaju was the parent-company of Marketing Labs, and Marketing Labs was a wholly-owned subsidiary of Nesmetaju.

27. Each Defendant is a "person" as that term is defined by 47 U.S.C. §153(39).

28. Each Defendant is effectively owned and operated by the same principals:

Mikhail Parshin, Furkat Kasimov, Maksym Holovchenko and Andrey Troshyn and Anton Ignatenko.

29. Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, alter egos, representatives, and insurers.

## FACTUAL ALLEGATIONS

### LeadsMarket, Nesmetaju and Marketing Labs

30. LeadsMarket is a data-broker and lead generation company which operates in the subprime personal and payday loan industry. LeadsMarket primary business model is to purchase "leads" from a network of "publishers" or "affiliates" and sell them to lenders at a profit. "Leads" are the names of individuals interested in subprime personal or payday loans. In this context, "publishers" or "affiliates" are companies or individuals who create advertising websites that find interested leads online by sending them SMS text messages, either directly or through marketing agents.

31. LeadsMarket's principals, directors and officers include but are not limited to Mikhail Parshin, Furkat Kasimov, Maksym Holovchenko and Andrey Troshyn and Anton Ignatenko.

32. Rather than sharing profits or making payment to independently-owned publishers, affiliates and marketers, the principals of LeadsMarket decided to create their own publishers, affiliates and marketers, which own and operate websites promoting subprime and high-interest loans, and market those websites through SMS text messages.

33. Two of those affiliate/publisher entities are Nesmetaju, LLC and Marketing Labs.

34. During the relevant time period, Nesmetaju owned and operated the BrightenLoan.com website at issue. A true and correct copy of a printout from the BrightenLoan.com website confirming it was owned by Nesmataju is attached as Exhibit "A."

35. The LeadsMarket/Nesmetaju principals created another affiliated company Marketing Labs LLC, which was at all times relevant, and is, a subsidiary of Nesmetaju. A true and correct copy a corporate disclosure statement confirming Marketing Labs is a subsidiary of Nesmetaju is attached as Exhibit "B."

36. Marketing Labs would send SMS text messages to consumers for the purpose of driving traffic to Nesmetaju websites.

37. LeadsMarket would then sell the consumer data entered into Nesmetaju websites to lenders in the subprime/payday lending industry.

38. Because LeadsMarket, Nesmetaju and Marketing Labs are all owned and operated by the same principals, as a practical matter, LeadsMarket does not need to share profits with, or otherwise pay independently-owned "affiliates", "publishers" or "marketers."

**Facts Specific to Roehrman**

39. At all times relevant hereto, Plaintiff, Thomas Roehrman owned a cell phone, the number for which is (317) XXX-7298.

40. At all times relevant hereto, Mr. Roehrman used that cell phone for primarily residential purposes such as speaking with friends and family.

41. Roehrman registered his cell phone number on the Federal Do Not Call Registry in or around April 04, 2008 in order to obtain solitude from invasive and harassing telemarketing calls.

42. On or around November 4, 2020, Marketing Labs placed several solicitation text messages to Plaintiff promoting payday loans and including a link to drive traffic to the Nesmetaju website "BrightenLoans.com."

43. The first text message from Marketing Labs appears to have originated from the (likely spoofed) phone number (216) 306-7044. That first text message and Roehrman's response thereto are copied below:



44. When Roehrman clicked the link in the text message, he landed on the Nesmetaju-owned payday loan/subprime loan webpage, BrightenLoans.com.

45. The terms and conditions on the BrightenLoan.com webpage disclosed the website is owned and operated by Nesmetaju. A true and correct copy of a printout from the website is attached as Exhibit A, with an excerpt copied below:

### Contact Information:

Company name: Nesmetaju LLC
Address: Springates Building, Lower Government Road, Charlestown, Nevis, Saint Kitts And Nevis
Email Address: support@BrightenLoans.com

**INFORMATION FOR ISPs:**

Website: www.BrightenLoans.com
Company name: Nesmetaju LLC
Email Address: support@BrightenLoans.com

46. Hours after receiving the first text message, Roehrman received a second text message from Marketing Labs soliciting payday loans through BrightenLoans.com.

47. This time, the message appeared to come from the number (216) 702-5980.

48. A copy of the second text message and Roehrman's response thereto is copied below:



49. Frustrated from receiving the unwanted text messages, Plaintiff replied "STOP."

50. Prior to receiving the aforementioned text messages, Plaintiff never consented to receiving such messages or sought out any of Defendants' services.

51. Plaintiff did not have any established business relationship with any of Defendants.

52. Plaintiff also did not seek out payday or subprime loans of any type, prior to the offending text messages.

53. The text messages were not sent for "emergency purposes," but rather for telemarketing purposes.

54. As a result of the foregoing, Plaintiff experienced frustration, annoyance, irritation and a sense that his privacy has been violated by Defendants.

**Direct and Vicarious Liability**

55. On May 9, 2013, the FCC reiterated the longstanding principle that a "seller" cannot contract its way out of liability by outsourcing telemarketing to overseas entities, or through the self-serving use of non-exclusive contracts:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would

8

> leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 FCC Rcd 6574 at 6588 (F.C.C. May 9, 2013) (internal citations omitted).

56. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*. at 6587 n. 107.

57. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

58. Defendants LeadsMarket and Nesmetaju hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by Marketing Labs.

59. This arrangement allowed LeadsMarket to sell leads to various subprime lenders while seeking to absolve itself of liability for the TCPA violations committed by its agent(s), over which it has complete control.

60. LeadsMarket and Nesmetaju control all aspects of Marketing Labs telemarketing activities.

61. In fact, Marketing Labs were only created to allow LeadsMarket to wash its hands of liability.

62. LeadsMarket and Nesmetaju provided scripts to Marketing Labs and controlled the content of Marketing Labs' text messages.

63. By making telemarketing calls to Roehrman and other putative class members with numbers on the Do-Not-Call registry, Marketing Labs was acting with express and implied actual authority of its principals Nesmetaju and LeadsMarket.

64. Further, Nesmetaju and LeadsMarket arealso vicariously liable under the theory of ratifcication.

65. Ratification of the conduct of another "may create an agency relationship when none existed before." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1074 (9th Cir. 2019) (*citing* Restat 3d of Agency, § 4.01).

66. There are widespread and prolific TCPA violations in the subprime lending industry.

67. LeadsMarket, Nesmetaju and Marketing Labs have received numerous complaints from consumers about unwanted telemarketing calls and text messages.

68. Defendants therefore had reason to be vigilant and mindful of TCPA violations by their agent(s), alter-egos and subsidiary entities.

69. Accordingly upon information and belief, LeadsMarket and Nesmetaju are vicariously liable for the text messages sent to Roehrman and the putative class and Marketing Labs is directly liable.

70. However, if LeadsMarket and/or Nesmetaju directly sent any unlawful text messages, they would be directly liable. If Marketing Labs acted through agent(s) rather than directly, Marketing Labs would be vicariously liable.

71. Defendants cannot evade liability through the creation of shell entities and clever contracting.

### Joint Enterprise

72. LeadsMarket, Nesmetaju and Marketing Labs had an agreement where Marketing Labs would send SMS marketing messages driving traffic to Nesmetaju/LeadsMarket websites without regard to whether the recipients had numbers on the Do-Not-Call registry or whether such recipients had consented to the communications.

73. The Defendants had a common purpose of generating web traffic to Nesmetaju/LeadsMarket websites in order to receive commissions from payday and subprime lenders, whose services are promoted on Nesmetaju/LeadsMarket websites.

74. Leads Market, Nesmetaju and Marketing Labs have common ownership and a common pecuniary interest in profiting as described above.

75. The Defendants each have an equal voice in the marketing activities and SMS text message operations used to drive traffic to Nesmetaju/Leads Marketing websites.

76. Defendants are jointly and severally liable for the violations of the TCPA committed while carrying out their joint enterprise.

### CLASS ALLEGATIONS

77. Plaintiff brings this claim on behalf of a class, pursuant to Federal Rule of Civil Procedure 23.

78. Plaintiff seeks to represent the following classes:

**Do-Not-Call Registry Class:** All persons in the United States where: (1) the person registered their phone number on the National Do-Not-Call Registry 31 or more days; (2) the person's number was registered to an individual rather than a business; (3) the person received two or more calls from Marketing Labs within twelve months; and (4) those text messages were for the purpose of driving web traffic to a website owned by Nesmetaju.

79. Plaintiff reserves the right to amend or modify the class definitions consistent with the record.

80. The putative class members' identities are readily ascertainable from Defendants' records or records within Defendants' control.

81. Plaintiff's claims are typical of the class members, as all are based on the same facts and legal theories.

82. Plaintiff will fairly and adequately protect the interests of the Class defined in this complaint. The Plaintiff has retained counsel with experience in handling consumer lawsuits, complex legal issues, and class actions. Neither the Plaintiff nor her attorneys have any interests which might cause them not to vigorously pursue this action.

83. This action has been brought, and may properly be maintained, as a class action pursuant to the provisions of Rule 23 of the Federal Rules Civil Procedure because there is a well-defined community interest in the litigation.

84. Class Members are so numerous and that their individual joinder of all class members is impracticable. There are no likely difficulties to be encountered in managing this case as a class action.

85. Common questions of law and fact exist to all Class Members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to the following:

- Whether an agency relationship between LeadsMarket and Nesmetaju can be established;

- Whether an agency relationship between LeadsMarket and Marketing Labs can be established;

- Whether an agency relationship between Nesmetaju and Marketing Labs can be established;

- Whether Defendants acted as a joint enterprise;

- Whether the text messages are "solicitations";
- Whether the text messages were in violation of the TCPA;
- If so, whether violations of the TCPA were "willful"

86. Plaintiff and the putative class members have claims arising out of Defendants' uniform course of conduct, namely improperly placing prerecorded voice calls to the Plaintiff and the putative class members.

87. Plaintiff will fairly and adequately protect the interests of the class members insofar and Plaintiff has no interests that are averse to the absent class members. Plaintiff is committed to vigorously litigating this matter. Plaintiff has also retained counsel experienced in handling consumer lawsuits, complex legal issues, and class actions. Neither the Plaintiff nor her counsel have any interests which might cause them not to vigorously pursue this class action lawsuit.

88. The class action mechanism is superior to other available means for the fair and efficient adjudication of this case. Each individual class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent and contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

89. Plaintiff received the offending text messages in this District. This District is therefore an appropriate forum in which to adjudicate this dispute. Based on discovery and

further investigation, Plaintiff may, in addition to moving for class certification, use modified definitions of the class, class claims, and the class period, and/or seek class certification only as to particular issues as permitted under Rule 23.  Such modified definitions may be more expansive to include consumers excluded from the foregoing definitions.

**COUNT I**
**DEFENDANT VIOLATED THE TCPA 47 U.S.C. § 227(c) AND 47 C.F.R. § 64.1200(C)**
**(*Federal Do Not Call Registry*)**

90.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

91.     47 U.S.C. § 227(c)(5) of the TCPA and its accompanying regulatory code, 64 C.F.R. § 64.1200(c), prohibit any person or entity of initiating any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National Do-Not-Call Registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. 47 U.S.C. § 227(c).

92.     Defendants contacted Plaintiff despite the fact that Plaintiff's telephone number had been registered on the Do Not Call Registry since April 04, 2008.

93.     Defendants' acts as described above were done with malicious, intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of harassing Plaintiff.

94.     The acts and/or omissions of Defendants were done unfairly, unlawfully, intentionally, deceptively and fraudulently and absent bona fide error, lawful right, legal defense, legal justification or legal excuse.

95.     As a result of the above violations of the TCPA, Plaintiff has suffered the losses and damages as set forth above entitling Plaintiff to an award of statutory, actual and trebles damages.

Wherefore, Plaintiff, Thomas Roehrman, individually, and or behalf of all other similarly situated, respectfully requests the Court grant the following relief:

a. Enter an order against Defendants pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying this action as a class action and appointing Roehrman as the class representative;

b. Enter an order appointing Kimmel & Silverman, P.C as class counsel;

c. Enter judgment in favor of Roehrman and the putative class for all damages available under the TCPA, including statutory damages of $500 per violation of 47 U.S.C. § 227(c) and up to $1,500 per violation of each subsection if Defendants wilfully violated the TCPA;

d. Injunctive relief (as provided under 47 U.S.C. § 227(c); and

e. Any other relief this Honorable Court deems appropriate.

Respectfully submitted,

Kimmel & Silverman, PC

Dated: April 17, 2024

By: */s/ Jacob U. Ginsburg*
Jacob U. Ginsburg, Esq.
30 E. Butler Ave.
Ambler, PA 19002
Phone: (267) 468-5374
Facsimile: 877-788-2864
Email: jginsburg@creditlaw.com
teamkimmel@creditlaw.com